1841.

McLaren
v.
Watson's Exs.

McLaren v. Watson's Executors.

A *general guaranty* of payment of a note, *without naming any person as the party guarantied* is a valid instrument, and may be enforced by any one who advances money upon it, declaring upon it as upon a *promise to himself;* but such guaranty is *not negotiable,* and consequently an action can be brought upon it only *in the name of the person in whose hands it first became available,* unless it be written *upon the note* the payment of which it guarantees or is *attached* thereto; in which case it may be treated as an endorsement having the quality of *negotiability,* with the further benefit of a *waiver* of demand and notice.*

ERROR from the Supreme Court. This was an action of assumpsit brought in the superior court of the city of New-York by *Daniel McLaren,* on an instrument bearing date 28th August, 1828, executed by *Joseph Watson,* whereby the latter *guarantied* the payment of a promissory note for $300, drawn by W. A. and E. C. Blackney, payable to the order of *William Watson.* The note endorsed by the payee and by two other persons was transferred, by one *Daniel M. Frye,* to the plaintiff, *together with the guaranty:* which guaranty was a *separate* and *distinct* instrument, not written *on* the note or on a paper *attached* to it. It was originally delivered to *Frye,* and was in these words: "I hereby *guarantee the payment* of a note at 60 days, drawn by William A. Blackney and Edgar C. Blackney, payable to the order of William Watson, (New-Milford, Connecticut,) William Watson, (393 Pearl-street,) and Daniel S. Tuthill, (13 Christopher-street,) for $300 for value received, dated April 28, 1828." The plaintiff declared upon the guaranty, and the defendant

---

* *Senator* VERPLANCK, who delivered an opinion for *reversal,* holds that according to the well settled principles of the common law, as well as the *law-merchant* prevailing on the continent of Europe, and in this state, a *general guaranty for the payment of a note* not made to any person by name, or for a specific purpose, may be enforced by action *in his own name* not only by the party to whom it is originally delivered, but *by a subsequent holder* of the note and guaranty, whether the guaranty be written *on* the note, on a paper annexed, or on a *separate paper*.

1841.

McLaren
*v.*
Watson's Exs.

pleaded *non-assumpsit*. No objection was taken on the trial to the *variance* between the note and its description in the guaranty, and besides it was shown that the defendant had admitted the validity of the guaranty. It was objected, however, that it being a *separate* and *distinct* instrument was *not negotiable,* and consequently an action could not be maintained upon it *in the name of the plaintiff*, and could be maintained only in the name of the person to whom it was originally delivered. This objection was overruled by the presiding judge, and the jury under his direction found a verdict for the plaintiff. There were various other objections raised and disposed of on the trial, not deemed important to be here noticed. Judgment was entered upon the verdict, and the defendant removed the record into the supreme court, where the judgment was *reversed*, and a *venire de novo* ordered. See the case and the opinion delivered in the supreme court by Mr. Justice *Cowen* in 19 *Wendell*, 557, *et seq.* After the suing out of the writ of error the defendant *died*, and his executors were substituted as plaintiffs in error. The plaintiff sued out a writ of error. The case was argued here by

*W. Kent*, for the plaintiff in error.

*C. O'Connor*, for the defendants in error.

*Points submitted and argued on the part of the plaintiff in error:*

I. Frye was a competent witness, free from interest. Being indebted to the plaintiff, as endorser of certain notes, he passes the note and guaranty to the plaintiff, who receives them " with full knowledge of the dispute concerning witness' title to them," and receives them " *as cash, and at his own risk*," and surrenders up to witness the notes, on which he was endorser. It is impossible to suppose a case of a witness more free from the objection of interest.

II. There were only two witnesses examined on the trial, viz: *Daniel M. Frye,* for the plaintiff, and *Edgar C. Blackney,* for the defendant. On this testimony the parties went to the jury, and the verdict was rendered for the plaintiff. Wherever, therefore, the testimony of the two witnesses is in opposition, Frye's must be assumed as the truth.

III. The case shows the following facts: A note, dated April 28, 1828, payable in sixty days, for $300, is guarantied by the testator, *Joseph Watson.* This note and guaranty were *accommodation paper,* and were not negotiated until 29th April, 1828. On the 29th of April, 1828, Daniel M. Frye receives the note and guaranty, bona fide, and advances on them a full and valuable consideration. Frye subsequently passes the note and guaranty for a valuable consideration to the plaintiff, who thus becomes entitled to all the rights of Frye on the note and guaranty.

IV. *As to the character of the guaranty.* It is an *absolute* promise to pay at the maturity of the note, *waiving demand and notice of non-payment. Allen* v. *Rightmere,* 20 *Johns. R.* 365. *Breed* v. *Hillhouse,* 7 *Connecticut R.* And is *distinguishable* in its nature, therefore, from the guaranty of the *collection* of a debt.

V. This guaranty is appurtenant to the note, and *negotiable* with it. 1st. Its being on a separate piece of paper is no objection. *Chitty on Bills,* 222. *Bayley on Bills,* 102. *Goodrich* v. *Goodwin,* 15 *Johns. R.* 6. 1 *R. S.* 757. 2d. This being the case, inasmuch as the engagement is in all respects tantamount to an *endorsement,* there can be no valid objection to its negotiability. It must be recovered on as an *endorsement.* 3d. There is nothing restrictive in it; on the contrary, in its terms, it was plainly meant to be negotiable. *Chitty on Bills,* 141. *Minch* v. *Gibson,* 3 *T. R.* 481 1 *H. Bl.* 56.

*Points submitted and argued on the part of the defendants in error:*

**1841.**

McLaren
*v.*
Watson's Exs.

I. The guaranty on which the original suit in the superior court was founded, was a special contract between *Joseph Watson* and *Daniel M. Frye*, and was not negotiable. 1. It is an inflexible rule of the common law, founded on the soundest policy, that *choses in action* are not negotiable. *Piggott* v. *Thompson*, 3 *Bos. & Puller*, 150. *Stat. Champerty*, 2 *R. S.* 691, § 6. *Gardner* v. *Adams*, 12 *Wendell*, 299. *Stedman* v. *Riddick*, 4 *Hawks' N. C. Rep.* 29, 3 *Hawks*, 560. *Chitty on Bills*, 7, 8. *Baldwin* v. *Calkins*, 10 *Wend.* 178. 2. Promissory notes are negotiable only by force of an express statute, which defines with the utmost precision the requisites to negotiability. 1 *R. L. of* 1813, 151, § 1. 1 *R. S.* 768, § 1, *still more precise. Thompson* v. *Sloan & al.* 23 *Wend.* 71. *De Forest* v. *Frary*, 6 *Cow.* 151. 3. A promise in writing, not expressed to be payable to bearer, and naming no promisee, is not void for that reason, but takes effect as a special contract with the person to whom it is first delivered. Oral proof may be given to supply the name of the promisee. *Brown* v. *Gilman*, 13 *Mass. R.* 158. *See* 6 *Wend.* 644; *Cases cited in* 19 *Wend.* 566. 4. A distinct and independent promise, guaranteeing payment of a promissory note, or otherwise relating to it, made by one who is neither a maker nor endorser, is not within the statute, and cannot be made negotiable. 5. There is no method by which a person can become a maker or endorser of a negotiable note within the statute, except by writing his name upon it. *See cases cited by supreme court*, 19 *Wend.* 567. *Douglass* v. *Wilkeson*, 6 *Wend.* 639. *Per Sewell, J., Tyler* v. *Binney*, 7 *Massachusetts R.* 481. *Upham* v. *Prince*, 12 *Mass. R.* 14. *Per Eyre, Ch. J. Gibson* v. *Minet*, 1 *H. Blackstone*, 605. *Chitty on Bills, American ed. of* 1836, 30, 272, 326. *Lamoureaux* v. *Hewitt*, 5 *Wendell*, 307. *See also Wilmington Bank* v. *Houston*, 1 *Harrington Delaware R.* 225. *Burdick* v. *Green*, 15 *Johns. R.* 249. 3 *Howard's Miss. R.* 193. *Billy Jones* v. *Witter*, 13 *Mass. R.* 307. *Calder* v. *Billington*,

15 *Maine R.* or 3*d Shepley*, 399. 2 *Fairf.* 354. *Estes* v. 1841.
*Hirston*, 1 *Devereaux N. C. Rep.* 356. *In the matter of*
*Barrington & al.* 2 *Sho. & Lefroy*, 113. *Williams* v. McLaren
*Granger*, 4 *Day*, 445. *Blanchard* v. *Bartlett*, 14 *Mass.* Watson's Exs.
*R.* 280; 3 *T. R.* 760. 6. The present case is not one in
which the court will strain a point to sustain the plaintiff.
Devices by which an attorney evading the statute can
shave notes, and, evading the common law, can make him-
self a witness in his own case, are not entitled to encour-
agement.

II. The guaranty, in fact, as appears by the oral proof,
and according to the literal and the legal import of its
terms, was an undertaking that the *makers* would perform
their contract expressed in the note, or that some one of
the endorsers would perform the contract implied in his
endorsement. Joseph Watson was, therefore, merely a
*surety*, as to whom the maker and all the endorsers stood
in the relation of principals; and the plaintiff below, hav-
ing, by omitting to make demand and give notice, dis-
charged some of those principals, *i. e.* the endorsers, was
not entitled to recover against the surety, Joseph Watson.
*Astley* v. *Ray*, 2 *Taunton*, 212. *Brown* v. *Williams*, 4
*Wend.* 360.

III. The note and guaranty were both void, because
purchased by Daniel M. Frye, the only witness, and the
real plaintiff in the cause, contrary to the statute to pre-
vent abuses in the practice of the law. 41*st Sess. ch.* 259.
*Laws of* 1818, 278. *People* v. *Walbridge*, 3 *Wend.* 120.

IV. The witness, Daniel M. Frye, was interested in the
event of the suit, and, therefore, incompetent. *Stedman*
v. *Gooch*, 3 *Esp. N. P. Cases*, 3. *Manufacturer's Bank*
v. *Gore*, 15 *Mass.* 80.

V. The guaranty was void, acccording to the statute
of frauds, for want of a consideration being expressed
therein.

After advisement, the following opinions were delivered:

*By the* CHANCELLOR. The testator in this case, by a separate and distinct instrument, which contained no words of negotiability, and was not endorsed or written upon the note, guarantied the payment of a note at sixty days, drawn by W. A. Blackney and E. C. Blackney, payable to the order of W. Watson of New-Milford, W. Watson of Pearl-street, and D. S. Tuthill, for $300: which guaranty, as the plaintiff alleges, was executed for the purpose of enabling one of the endorsers of the note to raise money thereon from D. M. Frye. Frye, who held the note and guaranty when the note became due and payable, or rather the guaranty and a note not correctly described in such guaranty, finding that the validity of his title to the note would be disputed, transferred the note and the guaranty to the plaintiff McLaren, who sued the personal representatives of the guarantor, in his own name, to enable him to use Frye as a witness to disprove the defence which it was anticipated would be set up.

Several questions were raised upon the argument, which I have not thought necessary to notice, as I am perfectly well satisfied that the objection that this separate guaranty was not negotiable, so as to authorize the assignee to bring a suit thereon in his own name, is well taken. A guaranty endorsed upon a negotiable note, whereby the guarantor agrees with the holder of the note that he will be answerable that the note shall be paid to him or to his order, or the bearer thereof, when it becomes due, is probably negotiable by the transfer of the note upon which it is written; for it is in fact a special endorsement of the note, or more properly a negotiable note in itself. But to make a guaranty negotiable as a part of the note to which it relates, it must be *on* the note itself, or at least it must be *annexed* to it: in the nature of *un allonge* or ekeing out of the paper upon which the note is written.

There is a mercantile guaranty, recognized by the codes of commerce, both of France and Spain, called an *aval*, by which the payment of a bill of exchange may be guaran-

tied. When the form of the *aval* is such that it can operate as a general endorsement, it will pass to any subsequent endorsee or holder of the bill, in the same manner as if it was an endorsement on the bill itself; but when it is restricted in its terms, as in case of an endorsement filled up without words of negotiability, it can only be sued by the person to whom it is given. *Code of Com. of France, Rod. Trausl., B. 1, art. 142. Code of Com. of Spain, in French, by Foucher, p. 165, tit. 1, § 6, art. 477, 478.* But to make the guarantor liable in those cases the same protests and notices are necessary as in the case of a real endorser. *Crivelli's Dict. Du Droit, tit. Aval.* That species of negotiable mercantile guaranty, is not even co-extensive with those countries where the civil law prevails; for in the case of *Cooley* v. *Lawrence*, 4 *Martins' Rep.* 640, the supreme court of Louisiana held that a guaranty of that nature was not known to the laws of that state, but must be governed by the rules of other special contracts. See also, 3 *Martin's Rep. N. S.* 659. 10 *Louis R.* 374. And Mr. Bell, the distinguished commentator on the commercial law of Scotland, where the civil law also prevails, distinctly expresses the opinion that the separate guaranty of a bill or note is not negotiable so as to authorize a subsequent holder to sue on it in his own name. 1 *Bell's Comm. on Com. Law of Scotland* 376.

There is nothing in the particular circumstances of this case, which can justify the court in overturning the established principles of law relative to the negotiability of written instruments, for the purpose of enabling the real party to the litigation to sell his interest to a third person, and to become a witness to support the claim. And as I have no doubt as to the correctness of the decision of the court below, upon the question I have thus examined, I shall vote to affirm the judgment.

By *Senator* VERPLANCK. Concurring with the supreme court in their view of the other points of this case, (such

*1841.*

McLaren *v.* Watson's Exs.

as that arising upon the competency of the principal witness, and the question of variance,) I shall confine myself mainly to the consideration of the two chief points to which the argument before us was principally directed.

The first of these, is as to the operation and effect of the statute of 1818, " to prevent abuses in the practice of the law." This, it is contended, renders void the note and guaranty in the hands of a subsequent holder, in consequence of their having been purchased by *Frye*, a practising attorney, from whom, and with knowledge of whose disputed title, the plaintiff received the paper. The statute, as it then stood, (before the revision,) inhibits any attorney at law, 1st. From buying any negotiable paper; and 2d. From lending or advancing money " in consideration of, or as an inducement to the placing in the hands of such attorney, or in the hands of any other person, any debt, demand, or chose in action, for collection." It is further enacted, that whenever it shall appear on examination " that any such *chose in action* hath been bought or procured, contrary to the true intent and meaning of this act, the plaintiff shall be non-suited." The act, however, expressly excepts from its operation the receiving such paper " in payment of a debt antecedently contracted." Moreover, it contains no words to inhibit an attorney from a *bona fide* loan of money, receiving therefor as collateral security, any endorsed negotiable paper made for the purpose of such security, provided it be a loan made in good faith, and not as an inducement or cover for placing such paper in his hands for collection. This is the fair construction of the statute, according to its avowed and obvious intent, " the preventing abuses in the practice of law." Nor shall we arrive at any different result if we apply the rule of a strict and literal interpretation.

Now, in this case, there was evidence of a prior debt of one hundred dollars, and also of a new actual loan of two hundred more, for all which a note of $300 with guaranty was received as collateral security: the borrower stating

his intention, and reserving the right to pay the whole amount and take up the note before it became due.   The evidence, therefore, of Frye, if credited by the jury, was sufficient to show that the transaction was merely receiving the note in part as collateral security for satisfying an antecedently contracted debt, and in part as security for an additional loan, with the declared intention and reserved right of the borrower to pay the debt before the note was at maturity and thus receive back his security.   Such an understanding is wholly inconsistent with any agreement or understanding of an absolute purchase of the note or of a loan made in consideration of, or as an inducement to the placing the note in the lender's hands for collection. Such a transaction, if thus proved, is neither within the letter of the statute, nor contrary to its policy and true intent.   The subsequent transaction, as it appears in Frye's testimony, showing that the note was passed away to the plaintiff without any reference to whose hands it might be placed in for collection, is equally inconsistent with any intended violation of the statute.   If the whole account of the business, as given by the plaintiff's witness, was correct, then this was not an illegal transaction on Frye's part.   It was, therefore, properly submitted to the jury, and their verdict shows that they gave credit to that testimony.   But the more precise language and better guarded provisions of the Revised Statutes, on this subject, have made this question of little interest or importance beyond its bearing upon cases like the present, which arose before the revision.

II. The next point is one, the decision of which must materially affect and regulate daily commercial usage in respect to loans and discounts.   The original defendant guaranties the payment of an endorsed note, made for accommodation.   The guaranty is written on a separate paper, and describes the note, with which it bears contemporaneous date.   It is general in its terms; not being a stipulation with any named person, but is in the broad and

1841.

McLaren
*v.*
Watson's Exs.

very common form, "I hereby guaranty the payment" of the note, which it then describes.

It is now maintained that such a guaranty being a promise in writing, naming no promisee, can take effect only as a special contract with the *first* person who on the faith of it becomes the holder of the note; and as no contract or mere *chose in action* is negotiable, except such as fall within the definition of promissory notes or bills of exchange, this guaranty, it is argued, is strictly a personal contract between the guarantor and the acceptor of the guaranty only, and it therefore cannot be transferred so as to be enforced in the name of any subsequent party. The special contract of warranty, therefore, between Watson and Frye, did not accompany the note as appurtenant to it and negotiable with it, when it was endorsed to the plaintiff. The supreme court, on this point, intimate the opinion that had the guaranty been written on the note it might have been treated as a mere endorsement, by striking out the special words and leaving barely the endorsed name; but they hold that a separate guaranty of a negotiable note or bill does not, like an acceptance or endorsement, run with its principal, but must end where it began, like a bond or other *chose in action.*   This intimation of the distinction between the effect of an endorsed guaranty, which may be converted into an ordinary endorsement by striking out words, and that of a stipulation of guaranty written on a separate paper, seems to be in contradiction to the decision of the same court in a former case.   In *L'Amoureaux* v. *Hewitt*, 5 *Wendell* 307, they are expressly placed on the same ground.   It was there held that an endorsed guaranty could not be stricken out and converted into a bare endorsement, but that every guaranty is a special contract with the person first receiving it, and can be enforced only in his name.   " The defendant," said Chief Justice Savage, " was liable upon his guaranty, not as an endorser, but as the party to a special contract, which might have been written on a separate piece of paper as

well as on the back of the note." If these views of the
nature of the contract of general guaranty of the payment
of bills or notes be correct, and if there be no positive rule
or custom of the Law Merchant giving effect to guaranties
of notes or bills, so as to make them pass with the paper
to which they relate, then I do not see how, upon the principles of our law as to the assignment of *choses in action*,
we can resist the conclusion that such a contract does not
go beyond the first taker of the paper, but can be enforced
only in the name of the actual guarantee. Let us, however, examine what is the real undertaking or promise of
such a guarantor.

A guaranty, according to its derivative and essential
meaning, is the warranty of some act or debt of another.
It is an undertaking that the engagement or promise of some
other person shall be performed. In its legal and commercial sense, it is an undertaking to be answerable for the
payment of some debt, or the due performance of some
contract or duty by another person, who himself remains
liable for his own default. Such a warranty may be either
of a prior debt, or previously subsisting contract, or it
may be for the due discharge of some future debt or contract, between the orignal party and some other person,
who may give him credit. In the first case, our law,
which enforces no contract not supported by some consideration, requires that there be some good consideration received by the guarantor. In the other case, where the
guarantor holds out his engagement of secondary liability
as an inducement to any one who may, upon the faith of
that promise, give credit in any way to a third person, if
there be no special consideration of benefit received and
acknowledged by the guarantor, as there often is, yet the
same consideration of debt or damage which supports the
claim against the principal in default, equally applies to,
and supports the right of action against the guarantor.
This rests upon the familiar principle that a sufficient consideration for any contract, may be either an actual benefit

to the party promising, or else some prejudice, damage, suspension of right, or possibility of loss, to the party to whom the promise is made or proffered, and by reason of his acceptance thereof. 3 *Burr* 1663, per Yates, J., whose definition is adopted in 1 *Williams' Saunders'* 211, *note* 2. See also, *Jones* v. *Ashburnham*, 4 *East*. 455; 12 *Wendell* 381.

With whom, then, may such a contract be made? Of course it may, as in other contracts, be made with a specifically named or described individual, to whom the promise and undertaking to become answerable for a third person is addressed. Such an offer or promise to any specified individual to become liable for the debt or acts of another, when it is accepted, by giving the credit or trust thus guarantied, is complete, and it can only be enforced by, or in the name of the original party giving credit on such guaranty. When the default occurs, the promise to make good that default becomes binding, and like other *choses in action*, except notes and bills, it is confessedly not negotiable or transferrable in law, so as to give a right of action, in his own name, to the new holder.

But such a contract of warranty may be also offered and perfected without any individual being named in the stipulation or promise of guaranty. It may be made as many other contracts are made, by a general offer to any one who may accept the terms, and in such case the offer, when accepted, binds the promissor. Such is the ordinary case of a contract made by effect of an advertisement or public notice, as to pay a certain price for materials, wheat, wood, &c. delivered at a specific place or time. So too, as was said by the Chancellor, *Cobham* v. *Upcott*, 5 *Viner Abr.* 527, cited in *Fell on Guaranties*, 44. "If a man make offers of a bargain, and then write down and sign them, and another person take them up and prefer his bill, that will be a sufficient agreement to take the case out of the statute." The validity and obligation of such a promise or undertaking, proffered to all the world, and accepted by

an individual, grow out of the very nature of a contract, as well as the daily usage and necessities of life and business. There is no need of authority to show that the same rule must apply to the similar offer of guaranty. But there is no want of express authority on that head. Thus, as remarked by Judge Cowen, " In *Phillipps* v. *Bateman*, 16 *East.* 355, it was not denied that a public promise by advertisement to guaranty the notes of a bank, upon which there was a run, would bind the promissor, and subject him to action at the suit of those who should forbear to press the bank, provided a consideration had been duly expressed, and an intent had appeared so to pay, although no one could be named." So again in *Walton, assignee,* v. *Dodson,* 3 *Carr. & P.* 163, it was held of a guaranty without address to any person. " Such a guaranty will enure to the benefit of those to whom or for whose use it was delivered." Again, in one of the courts of our own country, where the guaranty was in a letter to the person for whose benefit it was to be used, and was only a general undertaking to be answerable for his purchases to a certain amount, the court considered it as a guaranty which by its plain intendment might be offered to any one and accepted by any one. " The contract, according to its legal intent is proffered to any one who was the vendor of such goods as the purchaser wanted." *Bradley* v. *Cary,* 3 *Greenleaf* 233. In every such case, the undertaking of guaranty, though general in its offer, becomes when accepted, definite and binding between the guarantor and the person acting or trusting upon his credit. But when thus made definite and conclusive, the same broad principle of the law must still apply, that rights of action, not made negotiable by statute or the special custom of merchants can only be enforced in the name of the direct party to the contract.

What distinction then, exists between the ordinary commercial guaranty, as of a credit for goods purchased, and a guaranty of a negotiable bill or note ? There is a clear and

1841.

McLaren
*v.*
Watson's Exs.

manifest difference in the substance of the contract or un-
dertaking itself in regard to the parties to whom the gua-
ranty is proffered, and by whom it may be accepted, al-
though it is still governed by the same general legal prin-
ciples. The ordinary mercantile guaranty of a debt, or a
purchase, or a credit, is a stipulation to become liable for
another, for some specific debt or debts not negotiable in
the hands of a creditor, and which he cannot pass away.
When the debt is contracted on such a guaranty, the pri-
mary liability can go no further than the first parties; and
therefore there is no promise or undertaking held out by the
guarantor, to any other person, to give a subsequent credit.
Not so as to the undertaking or offer made by a guaranty of
payment of negotiable paper. That is a positive under-
taking and promise to become liable for its due payment,
in case of the default of the original parties, and this offer
is held out to every person who may, on the faith of it,
become the legal holder of such paper. It is a promise
or undertaking held out to a second, third or fourth en-
dorsee, as much as to the first holder; and the last of these
who advances his money upon such a guaranty, looks as
much as the first to the promise of the guarantor. The
offer is of an indefinite number of successive guaranties,
whilst in the case of a guaranty of payment for goods
bought on credit, the offer though it may be general in its
address, is only of some specific transaction, which be-
comes final as to the parties, when the offer is accepted.
The guaranty may not be negotiable in itself as a separate
contract, but it is a collateral promise to any and each in
his turn of the persons known or unknown, who may give
credit to a negotiable note, coupled with such a guaranty.
But as it can be enforced only by the holder who is enti-
tled to receive payment from the parties to the note itself,
there can be no breach of such an undertaking, or any
cause or ground of action, in respect to any one, who after
having made himself a party to the contract, parts with
the note, and ceases to be entitled to its payment. I can-

not imagine any reason of justice, policy, or legal authori-
ty, for giving legal effect to a contract of guaranty for any
future credit to another, preferred in writing to any person
indiscriminately who will give such credit, which does not
equally apply to the remote holder of a note or bill, who
has taken it after successive intermediate holders, but still
upon the faith of the original guaranty. He also guaran-
ties the payment of a note, by the very use of those words,
and in their common as well as their legal meaning and
understanding, holds forth this undertaking or engage-
ment. " I promise to any person who may, upon the
faith of this promise, become by purchase, discount or
otherwise, the bona fide holder of this note, to pay the
same, in case of its not being duly paid when at maturi-
ty."

The consideration may be either some specific payment,
security or benefit to the guarantor, or it may be merely
the value of the note paid at his request, and on his cre-
dit, to the person for whose benefit the guaranty is made
and intended. In the present case, the consideration is
the value of the note, acknowledged in the guaranty it-
self to have been received, and shown in evidence to have
been paid in cash at the request of the guarantor, to Tut-
hill, the last endorser at the date of the guaranty. The
whole contract and transaction, when analyzed, is briefly
this: *Watson,* as an inducement to and in consideration of
*Frye's* advancing at his request, to *Tuthill,* the value of a
certain note, upon the security of that endorsed note and
his guaranty, undertakes and promises for the benefit of
*Frye,* to any person who shall afterwards take and hold
the note, to be liable for the payment of the same, if
not duly paid at maturity. Now it seems plain to me,
upon the common principles of the law of contracts, ap-
plied to the nature of this transaction, and of its terms,
and the obvious understanding of the stipulation itself,
that such a guaranty of negotiable paper can be enforced
by and in the name of any subsequent holder of such pa-

per, who has taken it on the good faith of an accompanying guaranty, whether written on the back of the note or upon a separate paper.

I must add, that as between the present parties, the statutory requisition of the consideration being expressed in the written guaranty, does not in my view apply, as it is a transaction with a person taking the note after the tender of guaranty and on its faith. This is not a collateral but an independent contract. It is a new contract, upon which McLaren took the note, and his injury or exposure to loss is a good and sufficient consideration, in addition to and independently of any past and received consideration.

Whilst the general principles of the law of contracts and the analogy of the decisions as to other mercantile guaranties, proffered generally to whomsoever might accept them and give the required credit, support this conclusion, I find no authority really in opposition except that of *L'Amoureuax* v. *Hewitt*, before cited. Most of the cases apparently adverse are those where the guaranty was, in fact and in terms, a special agreement with an individual to secure the payment of a debt or a note to him specifically, as in the case of *Barrington and others*, 2 *Schoales & Lefroy* 113, before Lord Chancellor Redesdale, where the contract is strictly with the first parties, and confined to them; and it was of course held not to pass with the endorsed paper by endorsement.

The statement of an analogous case of admitted legal effect, and governed by the same principles, may place the present question in a clearer light. Suppose that some individuals interested in the stock of a chartered bank of doubtful credit, should induce some well-known great capitalist, in consideration of ample security and a commission, to guaranty the circulating bills of the bank by public advertisement. His undertaking and contract then would simply be this: " In consideration of certain payments and securities, I promise to any one who shall on the faith of this guaranty, receive as money the bills of the —— bank,

to pay the amount of any bills so received in default of redemption by the bank." Such a contract is allowed by our supreme court in the opinion in the present case, to be binding on the party, and it seems to be so considered in the English case of *Phillipps* v. *Bakeman*, 16 *East*. 355, which was decided on other grounds; but where, if such a guaranty had not gone beyond the first taker, the objection would have been fatal. Independently of legal authority, I think it must commend its own validity to the common understanding of men. Yet such a guaranty would not stop with the first person who took some of these bills, but would go on with each bill from hand to hand, as being a new promise to each successive taker. If it did not, it would defeat its own intention, and be utterly useless; yet that imaginary case differs from the present only in the guarantied paper being made payable to bearer, or being intended for circulation as money, and in the guaranty being printed daily in a newspaper, or once written on a single sheet. If the principle be sound and legal in the one transaction, it must be equally so in the other. Such are the grounds upon which my mind came to the conclusion, that the decision of the supreme court should be reversed, and that of the superior court of the city of New-York, sustaining the charge and direction of Judge Oakley, affirmed. This conclusion is much strengthened in my mind by considerations of great public policy, as it would give legal effect to a usage of guaranty of long continuance, of very great commercial convenience, and of general and constant practice in every part of our state in all kinds of business. The contract is as fair and just in itself, as it is useful to the public.

The opinion I have expressed as to its legal character and effect, is, moreover, corroborated by another view of the law of the case according to general commercial usage and authority, which I think correct, though I do not rest my decision mainly upon it; but as it results in the same conclusion with the reasons already given, I shall briefly

*(margin)* 1841.

McLaren
*v.*
Watson's Exs.

1841.

McLaren
*v.*
Watson's Exs.

state it. Bills of exchange are negotiable according to the "custom of merchants;" and "the law of merchants, and the law of the land," said Lord Mansfield, "are the same." Promissory notes are made negotiable by statute, which declares that they shall have the same effect and be negotiable in like manner as inland bills of exchange, *according to the custom of merchants.* Now, the custom of merchants as to bills of exchange is not merely the local, mercantile, habitual and ordinary usage of England, but it was and is that of the civilized commercial world, bills of exchange having, as all our text writers (Blackstone, Kent and others,) inform us, grown into use originally on the continent of Europe, and passed over with the extension of commerce into England. The continental law and custom of merchants accompanied the usage into that country, from which we have obtained alike the usage and the law. Thence it is that the work of Pothier "On the Contract of Exchange," or negotiable paper, is of authority, and is cited in England as to the mere technical and arbitrary usages of that law; and as well as the other and greater works of that learned and philosophical jurist upon the general principles of contracts, "is alike law at Orleans and at Westminster Hall." The custom of general proffers or undertakings of guaranty of negotiable paper, intended to accompany the paper, has not become very common in England, so as to give rise to litigation in the courts, as I find no decision there either expressly affirming or denying their effect in the hands of subsequent holders. But the validity of the usage seems to be taken for granted in the modern case already cited of *Phillipps* v. *Bateman,* 16 *East.* 355, where a separate advertisement of guaranty of notes of a bank, in doubtful credit, would have been allowed to have been valid and binding, had it not been for other legal difficulties. On the continent of Europe such a practice of guaranty is well known. This guaranty of negotiable paper is called *aval* by the French, and *avallum* by the German civilians. The present French code

of commerce declares that the payment of a bill of ex-
change, independently of the acceptance and endorsement,
may be secured by a guaranty. (*Par un aval.*) This gua-
ranty is given by a third person, either on the bill itself or
by a separate writing. *Code de Commerce, Liv.* 1, *tit.* 8,
§ 141, 142. The person thus guaranteeing is bound in the
same manner as the drawer and endorser. The same arti-
cle is found in the code of Napoleon's own time, regulat-
ing the law of the then *French Empire,* and it is still in
this respect as it was before, the law of *Belgium, Holland,*
and a large part, if not all, of *Italy* and *Germany.* It was
indeed but the declaring and recognizing the former law of
Germany as it is found in *Heineccius' Elementa Juris
Cambialis,* and of France as expounded by Savary and
Pothier. This last oracle of continental commercial law
says, that the guaranty may be either special, of acceptance,
or of a particular endorsement, or general, which last gives
to the holder the same right of action, which any party
may have against the drawer. The strict form he states to
be the writing or signing upon the bill itself; but he adds,
that " an experienced merchant informs him that guaran-
ties (*avals*) in this form are scarely any longer in use; and
that they were commonly made by a separate writing, (*par
un billet separe.*)" *Pothier Contrat de Change part* 2, §
50.

The same custom, and the same legal rule, prevail also
in *Scotland,* where the Law Merchant as to negotiable pa-
per is so closely assimilated to that prevailing in England,
that the decisions of Westminster Hall on that subject are
familiarly cited as authority in the courts and the books.
Mr. Bell, in his Commentaries on the Law of Scotland, 1
*Comm.* 376, after stating the question, " whether the in-
dorsation of a bill which has been guarantied by a separate
letter, accompanied by delivery of the letter of guaranty,
will give the same right as if the letter itself were a nego-
tiable instrument," adds, that " it is generally held by
bankers, that when they thus acquire a right to the guar-

1841.

McLaren
*v.*
Watson's Exs.

anty, they are entitled to payment from the surety, as if the letter had been originally addressed to themselves," and that in conformity with this understanding, it had been so adjudged in the highest court of judicature. He, indeed, criticises the ground of the decision, but the case of *Sir W. Forbes* v. *McNab,* decided by the lords of sessions, which he cites and states, recognizes the usage and sanctions its legal effect. I, therefore, think it probable, that this " custom of merchants " has passed over to us from our early Dutch colonists, or perhaps more recently from Scotch and French merchants settled among us, without having first travelled hither through the courts or the counting-houses of England. The custom of a general and indefinite guaranty, either on the note or bill, or on a separate paper referring to it, is well known to be common among our men of business in this state, and it is with the understanding of its passing with the note. If this were merely a local custom here, it could not control or contradict the settled law of the land; but it rather appears to be a part of the universal custom of merchants as to negotiable paper, in ordinary use here, as well as on the continent of Europe; but which, not having been equally common in practice in England, has never received the positive sanction of any adjudication there. I submit these views of history, and authority bearing on this question, to the consideration of those members of the court who may not be satisfied to rest their decision solely upon the application of those great principles of the doctrine of contracts, to the stipulation of guaranty, upon which I mainly rely.

I will notice briefly one other point of the argument. It has been maintained that *Watson* was a mere surety, and that there being no proof of demand and notice to the endorsers, previous to the guaranty, no recovery could be had against the surety. Judge Cowen's reply to this, is conclusive. The objection was not raised at the trial. Had it been, demand and notice might have been shown, or it might have been proved that the defendant received

it, or that he was the principal in the transaction. But, independently of this technical answer, the objection cannot be maintained. The obvious and general understanding of a guaranty of payment of a note, is never that the guarantor puts himself in the place of an endorser, who makes merely a conditional undertaking to pay upon default of the maker, provided due demand shall have been made and notice given, but, as Chief Justice Spencer said, " the undertaking is not conditional, it is absolute, that the maker shall pay the note when due, or that the defendant will himself pay it." *Allen* v. *Rightmere*, 20 *Johns. R.* 365. Accordingly, the decisions and text books all agree that an absolute guaranty of payment of a note or bill waives demand and notice of non-payment. *Breed* v. *Hillhouse*, 7 *Conn. Rep.* 528. 2 *Kent's Comm.* 124.

1841.

McLaren
*v.*
Watson's Exs.

I have just seen, since preparing this opinion, in the volume of Wendell's reports, published since the argument of this cause, a decision of the supreme court on a case nearly analagous to the present, with which I entirely concur, for the same reasons which induce me to dissent from their decision here; and I think it supports and fortifies the conclusions I have above stated. It is the case of *Kitchell* v. *Burns*, 24 *Wendell* 456, on a guaranty endorsed on a note which was payable to S. or bearer, the guaranty being of payment to S. or bearer. This was held good in the hands of a subsequent bearer, and negotiable in itself, not as a mere endorsement, striking out the guaranty. The chief justice considered it as " an absolute promise to pay the note, if the maker fail. It is a new note for the payment of the money upon full consideration, and as it is made payable to S. or bearer, it is negotiable." Now, a promise of guaranty to the *future bearer* of a note, payable to bearer, differs nothing, to my understanding, from the same promise made to the *future holder* of a note payable to order but endorsed in blank, and so passing by delivery. If the contract end with the first taker and cannot be enforced by a subsequent one, as to the note payable to

order, why should it be otherwise as to a subsequent holder of the note payable to bearer ?   The guaranty cannot be, literally speaking, a new note, for it is a note payable on a contingency: on default of payment by maker, *Buller N. P.* 272, and therefore not a negotiable note.   If good in the hands of the bearer or holder, as I doubt not it is, it is so on the general principle of the law of guaranty.

The affirming the decision now under review, would, I fear, leave the law on this interesting point of constant occurrence, unsettled and contradictory.   On the other hand, a reversal establishing the general rule that a guaranty of negotiable paper, in any form, may be enforced by any one who takes such paper on its faith, would simplify and harmonize the whole law, in conformity with the usages and convenience of business, and the spirit and intent of all similar transactions.

*By the* PRESIDENT *of the Senate.*   Although several points of minor importance have been made in the progress of this case, the main question presented for the consideration and decision of this court, is whether a separate guaranty of the payment of a promissory note can be made so negotiable as to run along with the note, and be available, in his own name, in the hands of any holder of the note, other than the party to whom the guaranty was originally given ?   This question, although of considerable general importance, is of peculiar interest to a commercial community.   The transfer, from hand to hand, of negotiable paper, with their various collateral guaranties, enters so constantly into the hourly transactions of commerce, that it is of great importance that the law determining the precise character and effect of these, should be well settled and well known.   Indeed, in no department of human affairs are fixedness, uniformity, and general knowledge of the laws, so important and necessary, as in the various operations of trade and commerce.   Merchants contract with reference to the laws.   Their rights and their obliga-

tions are determined by them. It is all important, there-
fore, that those laws should be fixed and known. This is
not more essential to the safety than it is to the prosperity
of commerce; and should be kept steadily in view in the
legislation and judicial proceedings of every enlightened
government that would foster and protect its foreign and
inland trade.

**1841.**

McLaren
*v.*
Watsons Ex's.

In all ages of the world it has been the policy of all
civilized nations to treat commerce with great favor and
regard. Its advancement and protection have been the
object of public treaties; while its usages have constituted
no inconsiderable part of municipal and international law.
So great has been the deference paid to *the custom of
merchants*, that it has not only been received as law in it-
self, but has even been permitted materially to modify
the common law of the land. In England so early as the
reign of James I. Chief Justice Hobart declared the custom
of merchants to be a part of the common law, of which the
judges ought to take notice, *Vanheath* v. *Turner*, *Winch.*
24; and Lord Coke, in his 2 *Institutes*, *p.* 404, speaking
of the *Lex Mercatoria*, says, " which, as hath been said, is
part of the laws of this realm."

It is a general rule of the common law, that choses in
action are not negotiable. But so early as the fourteenth
century, in conformity with the custom of merchants, and
for the benefit of trade, an exception was made to this ge-
neral rule in favor of foreign bills of exchange; and in the
seventeenth century a similar exception was made in favor
of inland bills. Promissory notes, from the same influence
and with the same view, to the encouragement of trade,
came very soon to enjoy the same favor, and be invested
with the same general characteristics. They continued to
be so considered and so treated until their character was
drawn in question by Lord Chief Justice Holt, in the case
of *Clerk* v. *Martin*, in 1702, 2 *Lord Raymond*, 757, and 1
*Salk.* 129. He denied that a promissory note, by the cus-
tom of merchants, had the character of an inland bill of

exchange; or that an action of debt could be maintained upon it as such. The several cases of *Potter* v. *Pearson*, 2 *Lord Raymond*, 759. *Burton* v. *Souter*, *Id*. 774. *Williams* v. *Cutting*, *Id*. 825; and *Buller* v. *Cripps*, in 1703, 6 *Mod*. 29, followed that of *Clerk* v. *Martin*, and adopted its doctrine. In the latter case, however, the court adjourned without coming to any decision. What, therefore, would have been its judgment, in that case, was at the time considered doubtful. These doubts as to what was the law upon this subject, whether originating in Lord Holt's excited controversy with the goldsmiths of Lombard-street, or in calm and deliberate judgment, is immaterial, they led to the enactment of the statute of the 3d and 4th of Ann. Without here stopping to consider the much agitated question, whether this statute was the enactment of new law, or merely declaratory of that which had before existed, but which had been drawn into doubt by recent decisions, it is sufficient that, so far as regards promissory notes, it was substantially re-enacted by the legislature of this state in 1788. It was revised and simplified in 1801; and again revised and incorporated in the Revised Statutes of 1830. It has since continued, and is now the law of this state.

The question here arises, whether this guaranty, written on a separate piece of paper, can be brought within the provisions of this statute, so as to make it negotiable and enable the holder of the note and guaranty to bring an action on the latter in his own name? It is certain that the guaranty is not in terms embraced within the statute; and it would, in my judgment, be most dangerous to extend the equity of the statute so far as to include this case within its undefinable limits. Waiving then, as before, the question whether the statute be the enactment of new, or merely the declaring of the old law; and even admitting the latter, let us inquire whether that custom of merchants, which, for the benefit of trade, made the promissory note negotiable, can, for the same purpose, be made

to apply, with like effect, to the separate guaranty of such promissory note ? It is believed that no such custom of merchants has ever existed, or does now exist, in this or any other country; and on the contrary, in adopting the doctrine advanced on the part of the plaintiff in error in this case, this court would be carrying the law on this subject one step beyond the legislation or known and acknowledged custom of merchants in any country. It is true, that the commercial codes of France and Spain and the edicts of some of the German states, do recognize as negotiable a separate guaranty of promissory notes and bills of exchange. These separate guaranties are called, in the two former countries, *aval*, and in the latter *avallum*. But in their character and effect, they are to all intents and purposes endorsements. They give the same rights, and impose the same obligations. To charge him who has given the *aval* or *avallum*, the same notice of demand and non-payment is necessary. The *French code* is as follows: " Le donneur d'aval est tenu solidairement, et par les mêmes voir que les tireurs et endorseurs, sauf les conventions differentes des parties." *Tome* 1, *tit*. 8, § 8, *art*. 42. The *Spanish code* declares: " Si l'aval est conçu en termes generaux, et sans restriction, celui qui le fournit rêpond du paiement de la lettre, de la même mamiêse et dans les mêmes formes que la personne dont il se rend garant." § 6, *art*. 478. It will thus be perceived that the *aval*, whether on the note or bill itself, or a separate piece of paper, and it may be either, is, in effect, an endorsement, giving the same rights and imposing the same and no other obligations; whereas the guaranty, under our laws, is a special and absolute contract for the payment of the note or bill, waiving the right to notice of demand and non-payment, by the maker or acceptor. In adopting the doctrine contended for, therefore, this court, while it would impose upon the guarantor all the obligations of an endorser or one who gives an *aval*, would deprive him of the important right to notice, enjoyed by the

1841.

McLaren
*v.*
Watson's Exs.

two latter, and often essential to the safety of the party entering into such obligations. The court would thus, as before remarked, carry the law upon this subject one step beyond the legislation of any country, or any known custom of merchants. It would, in short, be new law, and for its establishment would require the exercise of legislative rather than of judicial power. Hitherto the courts of this state have wisely, I think, adhered to the general rule, that to charge a party as an endorser of negotiable paper, his name, or the name of his firm, must be written upon the paper itself, or *un allonge*. A separate guaranty of such paper has been considered only as a special contract, not negotiable, and of course available in his own name only by the party to whom it was originally given.

Our courts have recognized as good, endorsements on negotiable paper in the form of a guaranty and in terms, negotiable, being to order or bearer, but on the ground that these were in effect new bills, and, therefore, valid as such, and not merely as guaranties of the original paper so endorsed. This was the recent case of *Ketchell* v. *Burns*, 24 *Wend*. 456, and of other previous cases.

It is true our statutes do, as the law did before, authorize a separate acceptance of a bill of exchange. If in this provision of the statute, and in the interests of commerce, a reason is supposed to exist equally applicable to a separate endorsement or guaranty of the payment of negotiable paper, let the aid of the legislature be invoked to give that provision such extension. This court has no power to do so, even if it were universally admitted to be desirable. What would be wise or desirable law is one thing; what is actually the law may be another and a very different thing. While the former regards exclusively the legislature, the judiciary can be governed only by the latter.

In this case, therefore, concurring fully in the judgment of the supreme court, and in the satisfactory reasons given

for that judgment in the opinion of Justice Cowen, I shall vote for an affirmance.

On the question being put, *Shall this judgment be reversed?* *three* members of the court answered in the *affirmative;* and *twelve* in the *negative.* Whereupon the judgment of the supreme court was AFFIRMED.